```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION


MARY E. HOLLINGSWORTH,              )
                                    )
            Plaintiff,              )
                                    )
     v.                             )    No. 4:11 CV 154 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )
```

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Mary E. Hollingsworth for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Administrative Law Judge's (ALJ) decision is reversed and remanded.

## I. BACKGROUND

On September 19, 2006, plaintiff filed her application, alleging that she was disabled due to a lower back injury, elbow surgery, wrist surgery, and fibromyalgia. She alleged an April 30, 2002 onset date. (Tr. 146-48.) She was born in 1964, completed two years of college, and has past work as an auto assembler, cleaner, kitchen helper, and office clerk. (Tr. 72, 146, 187.)

Plaintiff's application was denied on December 21, 2006. (Tr. 83-88.) On December 2, 2008, following an administrative hearing, an ALJ issued an unfavorable decision finding that plaintiff was not disabled as defined under the Act at any time when she met the earnings requirements of the Act. (Tr. 12-20.) On November 17, 2010, after considering additional evidence, the Appeals Council denied her request for review. (Tr. 1-3, 340-623.) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

Plaintiff saw a chiropractor, Dan Coogan, D.C., approximately 12 times from December 19, 2002 through March 4, 2006. (Tr. 275.) On December 19, 2002, she rated her pain as 10/10. She was diagnosed with cervical disc syndrome, cervical muscle spasm, and cervical radiculitis or inflammation. Coogan performed spinal adjustment at C-4, C-5, and L-5, and performed Electrical Muscle Stimulation (EMS) on the cervical, thoracic, and lumbar regions. He also applied cryotherapy to reduce pain.

On March 4, 2006, plaintiff reported her pain had improved 50%. (Tr. 276-89.) On December 5, 2006, Dr. Coogan completed a source statement on plaintiff's behalf, in which he states "there has never been any indication that this patient has any spinal disability. This patient has been sporadically in my office since 12/19/2006 with mostly mild to moderate pain. This patient has been seen 12 times since December 19, 2006 with never having severe pain." (Tr. 275.)

On December 16, 2003, plaintiff was seen by Leonard Lucas, M.D., at Family Medical Group. She was prescribed Ultram, a narcotic-like pain reliever, and Effexor XR, an antidepressant. On January 19, 2004, she was provided samples of Maxalt, for migraine headaches. (Tr. 265-66.)

Plaintiff was seen by Shawn Brunk, D.O., at Family Medical Group on January 20, 2004 for blood work. She was diagnosed with borderline high cholesterol and instructed to follow a special diet and return in six months. She was seen again at the Family Medical Group on February 6 and 9, 2006. (Tr. 263-69.)

Plaintiff was seen by Pierre Moeser, M.D., internist and rheumatologist, at Barnes Jewish Community Medical Group on January 13, 2006 with complaints of body pains for the past six months. Notes indicate the pain may have dated back to 1998. She had two laminectomies performed in 1997. In December 1998 she had two separate low back fusions. In 2000 she had right lateral epicondylar surgery which did not relieve her pain. She complained of nonrestful sleep, chronic insomnia, and severe daytime fatigue. She was a smoker. She had gained at least 45 pounds in the past year and weighed 186 pounds. She had 14/18 tender points. Dr. Moeser's impression was possible endocrinopathy and

fibromyalgia syndrome (FMS). He prescribed Flexaril, a muscle relaxant, and instructed her to start a weight loss program and to follow up in four weeks. (Tr. 252-53.)

She saw Dr. Moeser again on February 14, 2006. She still had severe nonrestful sleep and daytime fatigue. She recently had some slight neck pain with rotation but no radiculopathy symptoms. She also had left wrist pain with activity over the past few days but no numbness or tingling. She had 16 tender points. Dr. Moeser's impression was minor degenerative joint disease of the feet; possible cervical spondylosis, possible left wrist tendinitis and FMS. Most of the appointment was spent discussing the need for weight loss and exercise, and primary strategies for FMS treatment. She was instructed to follow up in three months. (Tr. 248.)

On December 12, 2006, plaintiff was seen for a consultative exam by Saul Silvermintz, M.D., an internist. She complained of low back injury, elbow and wrist surgery, and fibromyalgia. Upon examination, Dr. Silvermintz found one trigger point near plaintiff's left shoulder blade. Dr. Silverminitz's impression was status post numerous surgeries for disc disease of her lumbar spine with residual sciatica on the left and residual low back pain; status post surgery for right carpal tunnel syndrome; status post surgery for right epicondylar tendinitis; and moderate obesity. (Tr. 290-95.)

On February 16, 2007, plaintiff had an electromyogram and nerve conduction study which showed moderately severe, acute and chronic ulnar neuropathy in the left elbow and that was suggestive of cubital tunnel syndrome, the effect of pressure on the ulnar nerve.

On March 5, 2007, plaintiff was referred to John McAllister, M.D., an orthopedist at St. Peters Bone and Joint Surgery, for problems with her left elbow during the past six months. He diagnosed cubital tunnel syndrome and tennis elbow, recommending surgery for both conditions. (Tr. 323-24.)

Following surgery to her wrist in June 2007,[1] plaintiff attended physical therapy at Heritage Physical Therapy from June through August 22, 2007. During her most recent visit, she reported stiffness with flexion and extension of the left wrist and denied any significant pain in the left wrist. (Tr. 319-22.)

**Testimony at the Hearing**

On October 31, 2008, a hearing was conducted before an ALJ. Pam Edith Winkler, M.D., medical advisor (MA) and rheumatologist, appeared telephonically. Vocational Expert Delores Gonzalez also testified. Theresa Flieger, plaintiff's neighbor, was also present at the hearing.

Plaintiff testified to the following. She has headaches most of her waking hours. She has migraine headaches, which last three to five days, about three times per month, and takes Maxalt for them. She is totally incapacitated at that time. She has anxiety and takes Valium. She has insomnia and takes Ambien. Her lower extremities hurt when she wakes up at night and she takes Vicodin for that. She receives manipulations from Dr. Lucas, which give her temporary relief. She has pain and tingling radiating down her left arm and fingers and has no feeling in her left third finger. Her hands cramp and lock up. She has pain starting in the lower back that radiates to her buttocks and knees. Her feet and toes swell up for no apparent reason. She cannot wear normal shoes and wears tennis shoes or Crocs. Her daily medications include Vicodin, Ambien, Maxalt, Allegra, and Zanaflex, none which have any unwanted side effects. (Tr. 31-43.)

On a typical day plaintiff gets up, showers, and goes to the grocery store or does other errands. While at home, she may lie down for 45 minutes or so. She may lie down on the couch for five of eight hours per day. She does not sit much because it hurts to do so. She lives by herself in a trailer, although her neighbor, Theresa Flieger, helps her by feeding her three dogs, doing her laundry, helping her with grocery

---

[1] Records from this surgery are not part of the administrative record.

shopping, vacuuming, and any lifting. She rated her pain that day as 6 on a 10-point scale.

Standing increases her pain. Since her alleged onset date, she controls her pain by lying down, and spends more than half of her waking day lying down. She cannot use her right arm for pushing or pulling. Her forefinger and thumb work pretty well. She would like to work if she was capable of doing so. She does not think there is an easy job out there she would be capable of doing. (Tr. 43-57.)

MA Winkler testified that there are voluminous records that were not submitted, but that should have been made available, including actual surgery records from plaintiff's arm and wrist surgeries, neurosurgery evaluations, and post-op reports. The record also contains two conflicting reports addressing plaintiff's fibromyalgia. She has some problems with obesity and degenerative joint disease (DJD) of the big toe. (Tr. 62-63.)

MA Winkler testified that the omission of these records makes a significant difference as to plaintiff's functional limitations. A normal person who had a couple of back surgeries and a spinal fusion with rods, would probably need to change position every one to two hours for about five minutes. The records do not make any real reference to migraine headaches and anxiety. (Tr. 57-63.) Plaintiff clarified that she has about three migraines per month requiring her to take Maxalt. (Tr. 62-63.)

VE Gonzalez testified at the hearing and questioned plaintiff. Plaintiff testified that in 2001 and 2002 she worked at a grocery store owned by her sister doing clerical work while seated, and that she had done past office work for a car dealership. (Tr. 69-71.)

In the first hypothetical, the ALJ asked the VE to assume the plaintiff had the same limitations as indicated at the hearing, i.e., she needs to alternate positions frequently throughout the day and spends at least half of her waking day lying down to treat her pain. Under this hypothetical the VE testified that no such work activity exists. (Tr. 72-73.)

Under the second hypothetical, the ALJ asked the VE to assume plaintiff had the RFC suggested by the state agency (Tr. 296-301) with

modifications. She could lift ten pounds frequently, stand and walk at least two hours in an eight-hour work day, and could sit with normal breaks about six hours in an eight-hour workday. She would require an alternate sit/stand job with those parameters. She can sit for one half hour at a time before being allowed to change position, and must be up at least five minutes moving about before she can sit back down. She could never climb ladders, ropes, or scaffolding; and must not engage in work where balance was critical to the performance of her duties. Stooping, kneeling, crouching and crawling were limited to occasionally. She must avoid concentrated exposure to extreme cold, high levels of humidity and violent vibrations of the body. The VE testified that with those limitations she could return to sedentary, semiskilled, and unskilled work in the clerical field, particularly the past position with her sister. (Tr. 73-74.)

Under a third hypothetical, plaintiff was limited in the same way as the second, but would be limited in her use of her right hand and arm. The VE testified that different jobs would exist, that the clerical-type functions would cease, but there would be other jobs such as surveillance system monitor. Her past relevant work would be precluded. Upon examination by plaintiff's counsel, the VE testified that she believed plaintiff was credible. (Tr. 74-79.)

The parties stipulated that Theresa Flieger, plaintiff's neighbor, would have testified that she assists plaintiff in doing housework, taking care of her dogs, accompanying her to the grocery store, and lifting her groceries. (Tr. 79-80.)

### III. DECISION OF THE ALJ

On December 2, 2008, the ALJ issued an unfavorable decision. (Tr. 12-20.) The ALJ found that plaintiff last met the insured requirements of the Act on December 31, 2007. At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period from her April 30, 2002 alleged onset date through her date last insured, December 31, 2007. At Step Two, the ALJ found that plaintiff had the severe impairments of bilateral tendinitis and carpal tunnel syndrome, previous thoracolumbar scoliosis that previously required

lumbar surgery, possible fibromyalgia, and obesity. At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the requirements of a listing. (Tr. 10-15.)

The ALJ found that plaintiff had the residual functional capacity (RFC) to occasionally lift 10 pounds; frequently lift 10 pounds; stand or walk at least two hours in an eight-hour workday; sit six hours out of an eight-hour workday; and perform no more than occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; kneeling; stooping; crouching; and crawling. She must be allowed to intermittently rotate between sitting and standing or walking for the purpose of relieving her spinal pain. (Tr. 15.)

At Step Four, the ALJ found that plaintiff was capable of performing her past relevant clerical work as generally performed. Accordingly, the ALJ found that plaintiff was not disabled as defined under the Act. (Tr. 19.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least

twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her impairment meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant has the RFC to perform past relevant work. <u>Id.</u> The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. <u>Id.</u> If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. <u>Id.</u>

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) failing to fully develop the record; (2) improperly discrediting plaintiff's complaints; and (3) dismissing the VE's testimony that plaintiff would be unable to work in the national economy. The court agrees that the ALJ failed to fully develop the record and will reverse and remand on this ground for further development of the record.

The ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by counsel. <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1137 (8th Cir. 1998). The ALJ bears the responsibility to develop the record fairly and fully, independent of the claimant's burden to present her case. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)(holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone). The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 410 (1971) ("The social security hearing examiner,

furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994) (noting that the Commissioner and claimants' counsel both share the goal of assuring that disabled claimants receive benefits). Reversal of the ALJ's decision "due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Haley v. Massanari, 258 F.3d 742, 750 (8th Cir. 2001) (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

In this case, the ALJ failed to fully develop the record with regard to plaintiff's alleged conditions. Specifically, the ALJ failed to obtain records from which the MA could give an accurate opinion and failed to obtain an opinion from plaintiff's treating physician.

During the administrative hearing, the MA testified as to general assumptions, with the caveat that she did not have access to the "voluminous records that should [have] be[en] available which were not submitted." (Tr. 58.) The MA testified that the contents of records reflecting "neurosurgery evaluations, the actual surgeries, post-op reports, [and] anything about the actual surgery in terms of the arm and wrist" would have made a "significant difference" as to her opinion. (Tr. 58-59.) With her limited records, the MA testified that plaintiff had problems with obesity, a mild first MTP degenerative joint disease in her big toe, back problems, possible, wrist and elbow problems, possibly fibromyalgia, and possibly headaches or anxiety problems. The MA expressly premised her findings on the limited medical records she was given to evaluate. (Id.)

Without first obtaining and providing the MA with these records, the ALJ asked the MA to speculate as to plaintiff's limitations based on the findings in a physical RFC assessment indicating that plaintiff had thoracolumbar scoliosis and status post spinal fusion at L4 to S1. (Tr. 59, 296-301.) The MA opined that someone with those impairments would likely be limited to sedentary work and would likely need to alternate her position throughout the day and not sit or stand too long. (Tr. 60.) The MA also opined that a normal person who had previously had back surgeries and a spinal fusion with rods would likely need to change positions every one or two hours for five minutes at a time. Although

the MA noted that the records referenced a surgery, the records showed no evidence of ongoing carpal tunnel syndrom or elbow limitations. The MA opined that if elbow surgery was successful, plaintiff would be limited to lifting what was already done. The MA noted that the limited records contained no reference to migraines or anxiety, although plaintiff's medications indicated migraines were possible, and that it would be unusual for someone with disc surgery to require a frequent reclining position. (Tr. 58-64.)

The ALJ relied on the MA's testimony in determining plaintiff's RFC. In so doing, the ALJ did not note that the MA was operating with limited records and instead summarily stated that the MA's testimony was "consistent with the medical records." (Tr. 18.)

Had the ALJ developed the record, the ALJ would have seen that plaintiff had two lamenectomies in 1996 at St. Johns Mercy Hospital in St. Louis (Tr. 349); that plaintiff had a lumbar intervertebral disc without myelopathy and neuralgia, neuritis, and radiculitis in 1998 (Tr. 354); that plaintiff had a spinal fusion on December 11 and 15, 1998 (Tr. 378, 402-03); that plaintiff was doing well until October 4, 2000 when she called with low back pain radiating to her left buttock (Tr. 379); that plaintiff complained of more back pain on March 18, 2002 (Tr. 384); that plaintiff reported her right hand going numb, cramping up, and locking (Tr. 398); and that in September 1999 she reported more back and right hand pain, pain in both elbows and both shoulders, headaches, and joint pain (Tr. 469-70). Records from 2007 show treatment with Dr. John W. McAllister for her elbow pain, as well as references to wrist pain with a left tennis elbow release and ulnar nerve transposition. (Tr. 479-80.) There is also a reference to right tennis elbow release and carpal tunnel release done several years before 2007. (Tr 482.) Records from 2000 show the surgeries on her right hand and elbow. (Tr. 553-54, 570-72.) While records showing no complaints three months following the surgeries, the 2007 records show difficulties again with the right elbow and wrist.

Despite the MA's testimony that she lacked the medical records required to make a full evaluation, the ALJ did not attempt to obtain the records to fully develop the case, and instead relied upon the MA's

incomplete opinion.  Remand for evaluation of the records is appropriate because the new records may provide the information that the MA was lacking and may have altered the outcome of the disability determination. See, e.g., Lamp v. Astrue, 531 F.3d 629 (8th Cir. 2008) (remanding for evaluation of a letter from the claimant's physician that was first submitted to the Appeals Council); Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004) (remanding for the ALJ to obtain additional records that could have undermined the ALJ's findings).

Further, at the hearing, plaintiff's former counsel stated that he had asked plaintiff to get an opinion from Dr. Lucas, plaintiff's treating physician, but that she was unable to get it.  Counsel asked for the record to be left open for 15 days to obtain that opinion.  Although the ALJ agreed to leave the record open, at the end of the hearing counsel subsequently withdrew his request. (Tr. 26, 81.)  The ALJ, aware that a treating doctor's opinion was available, did not attempt to get it.  However, the ALJ then stated in his decision that "the medical records do not document that any treating physician has ever found or imposed any long-term, significant, and adverse physical limitations on the claimant's functional capacity."  (Tr. 19.)  In this situation, it would have been appropriate for the ALJ to ask the treating physician to comment on plaintiff's ability to function in the workplace considering her severe physical impairments.  Nevland, 204 F.3d at 858.

Therefore, remand is necessary for the ALJ to provide the MA with a full set of plaintiff's medical records upon which the MA can give a complete opinion.  On remand, the ALJ should also attempt to obtain Dr. Lucas's opinion.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded for further proceedings.  An appropriate Judgment Order is issued herewith.


　　　　　　　　　　　　　　　　　　／S／　　David D. Noce　　　　
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on February 23, 2012.